# Exhibit A

## IN THE COURT OF COMMON PLEAS, SUMMIT COUNTY, OHIO

CASE NUMBER:    CV-2023-11-4205

JACK DIAMOND
181 Ely Road
Akron, OH, 44333

-VS-                                                                      **SUMMONS**

VALUEHEALTH LLC
5000 COLLEGE BOULEVARD
Overland Park,   KS   66211

**TO the following:**

VALUEHEALTH LLC
5000 COLLEGE BOULEVARD
Overland Park, KS   66211

You have been named as a defendant(s) in a complaint filed in the Summit County Court of Common Pleas, Summit County Courthouse, 205 S. High St., Akron, Ohio, 44308.

A copy of the COMPLAINT is attached hereto.   The name and address of the Plaintiff's attorney is:

HAMILTON   DESAUSSURE, JR
3475 Ridgewood Road
Akron, OH   44333

**You are hereby summoned and required to serve upon the attorney listed above, or upon the party if they have no attorney of record, a copy of an answer to the COMPLAINT within twenty-eight (28) days after service of this summon on you, exclusive of the day of service.   Your answer must be filed with the Court within three days after the service of a copy of the answer on the attorney, or upon the party, if there is no attorney of record.**

**If you fail to appear and defend, judgment may be rendered against you for the relief demanded in the COMPLAINT.**

Sandra Kurt
Summit County Clerk of Courts

November 9, 2023

IN THE COURT OF COMMON PLEAS
SUMMIT COUNTY, OHIO

| | | |
|---|---|---|
| JACK DIAMOND | ) | Case No.: |
| 181 Ely Road | ) | |
| Akron, OH 44333 | ) | JUDGE |
| | ) | |
| Plaintiff | ) | |
| | ) | **COMPLAINT:** An Action for |
| vs. | ) | Breach of Contract |
| | ) | |
| VALUEHEALTH LLC | ) | |
| 1121 Roe Avenue | ) | |
| Suite 320 | ) | |
| Leawood, KS 66211 | ) | |
| | ) | |
| Defendant | ) | |
| | ) | |

For his Complaint, Plaintiff Jack Diamond states as follows:

### Overview

1.     Plaintiff Jack Diamond ("Diamond") was at all relevant times a minority member of an Ohio limited liability company known as Health Care Facilities Partners, LLC ("HCFP") and investor in various medical facilities that utilized the moniker HCFP. Diamond brings this Action against ValueHealth LLC ("ValueHealth") for compensatory damages caused by Defendant's breach of an agreement to purchase Diamond's interest in HCFP entities.

### The Parties
### And
### Personal Jurisdiction

2.     Diamond is an Ohio citizen and resident of Summit County, Ohio. Diamond entered into an agreement described herein with ValueHealth on October 29, 2020. The agreement was amended in writing on November 4, 2020, and together form the Purchase and Sale Agreement ("PSA"). The PSA is hereto as Exhibits A.

1

3.      ValueHealth is a duly formed Nevada entity with its principal place of business in Leawood, Kansas.  ValueHealth contracted in Ohio to purchase Ohio limited liability companies which managed Ohio medical facilities and ambulatory surgery centers.

4.      ValueHealth transacted business in Ohio for the purchase of companies owning and/or managing Ohio medical facilities and is therefore subject to this Court's jurisdiction pursuant to Ohio R. Civ. P. 4.3.

5.      Venue is appropriate in Summit County pursuant to Ohio R. Civ. P. 3(C)(7) as ValueHealth is an out of state defendant and Plaintiff Diamond resides in Summit County, Ohio. Venue is also proper in Summit County under Ohio R. Civ. P. 3(C)(3) when ValueHealth repudiated its contract with Diamond in Summit County.

**Transaction History**

6.      From a period extending from 2014 through October 2023, Diamond was a member of Health Care Facilities Partners, LLC ("HCFP") and became a member of other HCFP entities, including Health Care Facilities Partners Administration, LLC ("HCFPA") during that time frame. Diamond was previously a manager of HCFP and HCFPA.  HCFP and HCFPA were and are limited liabilities companies organized in the State of Ohio.  HCFP and HCFPA are involved in owning and/or managing ambulatory surgery centers in Ohio and elsewhere.

7.      ValueHealth was and is a digital health company which owns or operates ambulatory surgery centers in the United States.  ValueHealth has explored expanding its operations into Ohio markets.  In mid-2020, ValueHealth Health partnered with University Hospital Health Systems to form a joint venture to establish a network of surgery centers in Northeast Ohio.   In connection with that effort of expanding into Ohio markets, in March 2020 ValueHealth began exploring the purchase of an ownership interest in HCFP and related entities.

2

ValueHealth attempted direct negotiations with HCFP for some ownership in HCFP.    However, HCFP did not enter into a contract with ValueHealth to sell an ownership interest to it.

8.      Later in 2020, ValueHealth began negotiating with Diamond for the purchase of Diamond's membership interest in HCFP and other HCFP entities and was interested in purchasing the HCFP membership interests held by two other minority owners who had wished to sell their HCFP units along with Diamond.

9.      On October 29, 2020, a "Purchase and Sale Agreement" ("PSA") was signed by Diamond and ValueHealth for the purpose of ValueHealth's purchase of Diamond's HCFP interests.  The PSA was amended on November 4, 2020.  The executed and amended PSA is attached hereto as Exhibit A.

10.     In the PSA, ValueHealth agreed to 1) immediately indemnify Diamond for HCFP loan guarantees signed by Diamond and set forth in Schedule 1 of the PSA; 2) indemnify Diamond from any actions taken by HCFP; and 3) provide a process for the payment of the agreed upon purchase price for Diamond's units in the HCFP companies.  The purchase price reached in the PSA for Diamond's interests was approximately $1,300,000 based on the formula established in the PSA.  The purchase price was to be paid in either ownership units in ValueHealth or cash.

11.     Throughout the Fall of 2020 and Spring of 2021, ValueHealth entered negotiations with HCFP as to ValueHealth's future status as an owner of HCFP.  ValueHealth undertook those negotiations without input from Diamond. By the end of April, no agreement had been reached between ValueHealth and HCFP.

12.     ValueHealth did not make payment to Diamond in either stock or cash by May 1, 2020, as required by the PSA.

13.     On May 24, 2021, various HCFP entities filed suit against Diamond and ValueHealth in federal court in an action captioned *Health Care Facilities Partners, LLC, et al v.*

3

*Diamond et al.*, Case No. 5:21 -cv-01070-BMB (the "HCFP Litigation") seeking declaratory relief and asserting a claim for damages because of Diamond's decision to enter the PSA with ValueHealth.  Diamond tendered his defense to ValueHealth, but ValueHealth has refused to defend Diamond and has disclaimed any obligation to indemnify him from the claims asserted in the HCFP Litigation.

14.    ValueHealth also has failed to pay for Diamond's units, as required by the PSA.  In addition, and despite Diamond's demand, ValueHealth has refused to indemnify Diamond on the loan guarantees described in the PSA and has repudiated any obligation to indemnify Diamond for the claims asserted by HCFP.

15.    In late 2022, one of the loans identified in the PSA for which ValueHealth indemnified Diamond was in default and the issuing bank exercised its rights against the guarantors, including Diamond.  Despite being placed on notice of default and being requested to indemnify Diamond for his portion of the loan guaranty, ValueHealth refused to undertake responsibility for the loan obligation despite the terms of the PSA requiring it to do so.  On November 18, 2022, Diamond was required to and did pay $210,865.00 to satisfy his obligation as guarantor on that one loan.

16.    On June 5, 2023, the federal court in the HCFP Litigation granted summary judgment to Diamond against HCFP on its claim of "misappropriation of trade secrets" which formed the jurisdictional basis for HCFP's filing in federal court.  The District Court also determined that it would not exercise its pendent jurisdiction over the remaining state law causes of action.  The District Court entered an order of dismissal of the HCFP Litigaiton on August 31, 2023.  Diamond has incurred significant litigation costs and attorney fees in defending the claims, but ValueHealth has refused to indemnify Diamond for those costs.

## COUNT ONE
## BREACH OF CONTRACT

17.     Diamond restates the allegations of paragraphs 1 through 16 as if fully rewritten herein.

18.     A valid contract for the sale of Diamond's interest in the HCFP enterprise to ValueHealth existed as of October 29, 2020.  The contract was amended on November 4, 2020, and forms the PSA.

19.     Pursuant to the terms of the PSA, as of the execution of the PSA, Diamond was to be immediately indemnified on his loan guarantees which were specifically identified in the PSA as amended.

20.     Pursuant to the terms of the PSA, as of the execution of the PSA, Diamond was to be immediately indemnified for claims, if any, brought by the HCFP companies or by its members against him on or after October 29, 2020.

21.     Diamond performed all his obligations under the PSA and co-operated with all requests of ValueHealth as required by the PSA. The "closing" described in the PSA for the transfer of Diamonds units to ValueHealth, was to occur no later than May 1, 2021, when ValueHealth was either to make a payment of cash or a payment in units of ValueHealth, and when Diamond in return would endorse and transfer his units to ValueHealth.

22.     After the PSA was executed, on or about November 13, 2020, ValueHealth requested that Diamond confirm his sale of his HCFP membership units to ValueHealth for purposes of ValueHealth's discussions with HCFP by executing a document prepared by ValueHealth entitled "Assignment."  Diamond complied with ValueHealth's request.

23.     Diamond has requested that ValueHealth honor its contractual obligation to protect him on his outstanding loan guarantees as set forth in the PSA.  ValueHealth has refused to honor its contract obligation to indemnify Diamond on outstanding loan guarantees, including one where

Sandra Kurt, Summit County Clerk of Courts

the bank declared HCFP to be in default. Diamond has presently been damaged by ValueHealth's breach of this contract promise in the amount of $210,885.00.

24.    Further Diamond has requested that ValueHealth honor its contractual obligation to indemnify him from the HCFP Litigation. ValueHealth has refused to honor its promise to indemnify Diamond on claims asserted by HCFP entities against Diamond and has refused to defend Diamond on those claims. Diamond has been damaged by this conduct.

25.    Diamond has requested that ValueHealth honor its May 1, 2021, payment obligation for the transfer of his units. ValueHealth has refused to make payment of the Purchase Price. Diamond has therefore been damaged by ValueHealth's refusal to fulfill this obligation under the PSA to make its payment of approximately $1,300,000.

Wherefore Plaintiff Jack Diamond prays for compensatory damages in excess of $25,000 and requests attorney fees and costs and other relief this Court deems fair and equitable.

/s/Orville L. Reed III
Orville L. Reed, III (#0023522)
Hamilton DeSaussure, Jr. (#0023516)
David W. Hilkert (#0023486)
Stark & Knoll Co., L.P.A.
3475 Ridgewood Rd.
Akron, OH 44333
Telephone:    (330) 572-0328
Telefax:    (330) 572-0329
Email:    oreed@stark-knoll.com
dhilkert@stark-knoll.com
hdesaussure@stark-knoll.com

Attorneys for Plaintiff

4891-7778-7788 v.1

6

```
+------------------+
|    EXHIBIT       |
|                  |
|      A           |
+------------------+
```

## PURCHASE AND SALE
## AGREEMENT

This Purchase and Sale Agreement (**"Agreement"**) dated October 29th 2020 (**"Effective Date"**) is made by and between Jack Diamond (**"Seller"**) and ValueHealth, LLC ("the **"Buyer"**).

### RECITALS

WHEREAS, Seller holds 34% of membership interests in Health Care Facilities Partners, LLC, an Ohio limited liability company, (**"Company"**); and

WHEREAS, Seller wishes to sell and convey one hundred percent (100%) of his ownership interests in the Company (the **"Transferred Units"**) to Buyer, and Buyer wishes to purchase and acquire the same, on the terms and conditions set forth herein.

NOW, THEREFORE, for good and adequate consideration, the receipt and sufficiency of which being hereby acknowledged, the parties hereto hereby agree as follows.

Section 1. Purchase Price. The parties agree that the minimum full enterprise value of Company is Twelve Million Five Hundred Thousand and 00/100 Dollars ($12,500,000.00) minus outstanding Company debt, provided that if the Company has a formal valuation or is sold between the Effective Date and Closing Date for a value of more than $12,500,000, the higher value is the full enterprise value of the Company for purposes of establishing the Purchase Price. The Purchase Price of the Transferred Units is $12,500,000, unless the Company is valued higher, minus outstanding Company debt as of the Effective Date, times 34% ("Purchase Price"). The Buyer shall pay the Purchase Price by issuing to Seller an equivalent value in membership units in Buyer based on Buyer's enterprise value. Should the sale of the Transferred Units by Seller create a taxable event for Seller, the portion of the Purchase Price equal to Seller's tax liability shall be paid by Buyer in cash in lieu of membership units.

Notwithstanding anything here to the contrary, Buyer's obligation to close any transaction contemplated herein will be subject to Buyer's completion of all reasonable financial, legal, and regulatory due diligence by Buyer to confirm the accuracy of all representations by Seller. Should Buyer's due diligence disclose any material errors or misrepresentations by Seller, the Parties shall adjust the Purchase Price to a sum mutually agreed upon by the Parties.

Section 2. Valuation of Buyer. Buyer shall obtain a neutral third-party valuation of its enterprise value by March 31, 2021.

Section 3. Sale; Closing. Within ten (10) days of receiving the valuation, Buyer shall issue the requisite number of membership units in Buyer that equal the Purchase Price ("Closing Date"). Should Buyer fail to issue the units within ten (10) days, Buyer shall pay the Purchase Price in cash to Seller by May 1, 2021. Upon payment of the Purchase Price by Buyer, Seller shall deliver any and all certificates representing Transferred Units to Buyer, indorsed in blank, which shall be held by Buyer. Effective as of the payment of the Purchase Price, Seller shall be deemed to have sold and conveyed the Transferred Units to Buyer, and Buyer shall be deemed to have purchased same, all without the execution or delivery of additional instruments.

Section 4. Indemnity. For and in consideration of the terms and conditions of this Agreement, upon the Effective Date, Buyer will indemnify Seller and hold harmless Seller from

any claims and responsibilities of Seller arising from or out of the "Company Guarantees" or from activities of the Company or its members from the Effective Date forward. In addition, Seller and Buyer will collectively work to cause Company to remove Seller as a guarantor of the Company Guarantees. To the extent any lenders will not remove Seller as a guarantor without a substitute guarantor, Buyer agrees to act as a guarantor in lieu of Seller. "Company Guarantees" are described in Schedule 1, attached.

Section 5. Effective Date and Time. To the maximum extent permitted by law, the transfer shall be deemed for all purposes to have occurred as of the Closing Date, notwithstanding that Seller's membership units will not be transferred to Buyer until the Purchase Price is paid. All tax items of income, gain, loss, deduction, and credit attributable to the Transferred Units shall be apportioned to Seller using the daily pro ration method as determined and applied by Company, in Company's sole discretion. With respect to the Transferred Units, Seller will not be entitled to participate in any distributions attributable to Company operations occurring on or after the Effective Date.

Notwithstanding the foregoing, any funds received by Company for the Lakeway Settlement shall be paid to Seller. If Company pays the funds to Buyer, then Buyer will immediately send the funds to Seller. In addition, any distributions by Company for activities conducted prior to the Effective Date shall be sent to Seller. For distributions related to any activities that straddle the effective date, meaning those that began prior the Effective Date but were consummated or closed after the effective date, the parties will agree on an equitable allocation of those funds.

Section 6. Finder's Fees. Seller is entitled to a finder's fee from Company equal to $100,000 upon the closing of an equity purchase transaction between Buyer and the Andrews Institute for Orthopedics & Sports Medicine. If Buyer closes on the potential transaction with Andrews Institute for Orthopedics & Sports Medicine, Buyer shall pay the finder's fee to Seller. Closing on the Andrews transaction shall mean full syndication. All potential finder's fees are separate and apart from Seller's activities and actions as a member in the Company.

In addition, Buyer shall also pay Seller a finder's fee as described below for any merger or acquisition transaction, joint venture, or other equity purchase transaction, not including the Andrews transaction described above, in which Seller is instrumental in introducing the parties, developing the transaction, and finalizing the transaction (a "Transaction Opportunity").

The amount of the finder's fee will be based upon actual distributions of profits from the Transaction Opportunity's business, as follows:

| Equity owned by Buyer | Finder's Fee |
|---|---|
| Less than 15% | 0 |
| At least 15% but less than 25% | 1% |
| At least 25% but less than 35% | 1.5% |
| Greater than 35% | 2.0% |

For example, if Buyer owned 40% in a Transaction Opportunity that resulted in

$100.00 in distributions paid to Buyer, then Buyer would pay Seller $2.00.

Buyer reserves the right to structure the above arrangement(s) involving Transaction Opportunities by and/or through an affiliate of Buyer, including but not limited to, Nueterra Capital, LLC.

In addition to the above, Buyer agrees that Seller shall have the opportunity to Transaction Opportunities which are approved by Buyer on a deal by deal basis on terms reasonably agreed to by the Parties.

Section 7. <u>Restrictions</u>. The Seller acknowledges that the Buyer is generally engaged in business throughout the United States. During the term of this Agreement, beginning on the Effective Date, Seller agrees that he will not, unless acting with the prior written consent of the Buyer, directly or indirectly, own, manage, control, or participate in the ownership, management or control of, or be employed or engaged by, or otherwise affiliated or associated with, as an officer, director, employee, consultant, independent contractor or otherwise, any other corporation, partnership, proprietorship, firm, association or other business entity, which is a Direct Competitor of the Buyer's business except for such investments which occurred prior to the Effective Date. As used herein, "Direct Competitor" means a person or business who is competing with the Company to provide the same or similar products or services as the Buyer, or any of their predecessors, successors, or affiliates. Notwithstanding anything to the contrary herein, legal services performed the law firm Brennan, Manna & Diamond shall not be restricted in any manner.

Section 8. <u>Representations and Warranties of Seller</u>. Seller hereby represents, warrants, and covenants to Company as follows:

a. That Seller is, and as of the Effective Date specified herein will be, the lawful owner of Transferred Units, free and clear of any liens, pledges, security interests, encumbrances, and claims of any kind;

b. That Seller has the full right and authority to sell and deliver the same in accordance with this Agreement, without the consent or approval of any other person or entity and without complying with the terms of any transfer restrictions except those being complied with by the signatures set forth below;

c. That no other contracts exist for the sale or transfer of Transferred Units, or any interest therein and Seller will not seek to otherwise transfer the Transferred Units to any third party;

d. That the delivery of this Agreement will, upon the Effective Date, transfer valid title to said Transferred Units to Buyer, free and clear of all liens, pledges, security interests, encumbrances, and claims, of whatever nature, kind, or substance;

e. That Seller has been given full opportunity to ask questions and receive answers concerning the Transferred Units, the past and future operations and prospects of Company, and the sale of the Transferred Units pursuant to the terms hereof; and

      f.      That there are no unpaid capital contributions currently required (including any that are currently required but payable at a future date) with respect to such Transferred Units.

      Section 9.      <u>Miscellaneous</u>.

      a.      <u>Integration.</u> This Agreement constitutes the entire agreement among the parties hereto pertaining to the subject matter hereof and supersedes all prior agreements and understandings pertaining thereto.

      b.      <u>Counterparts: Facsimile.</u> This Agreement may be executed by facsimile, and/or in counterparts, all of which together shall constitute an agreement binding on all the parties hereto, notwithstanding that all such parties are not signatories to the original or the same counterpart. Each party shall become bound by this Agreement immediately upon affixing its signature hereto, independently of the signature of any other party.

      c.      <u>Survival</u>. All representations and warranties shall survive the execution and delivery of this Agreement, its acceptance, the transfer of Transferred Units, and the issuance of any certificates.

      d.      <u>Further Action.</u> The parties to this Agreement shall execute and deliver all documents, provide all information, and take or refrain from taking action as may be necessary or appropriate to achieve the purposes of this Agreement.

      e.      <u>Applicable Law</u>. This Agreement shall be construed in accordance with and governed by the internal laws of the State of Ohio, without regard to the principles of conflicts of law.

      f.      <u>No Effect Until All Signature Received.</u> This document is void and of no effect until and unless appropriately signed and delivered by all parties to this Agreement.

      g.      <u>Capitalized Terms.</u> Capitalized terms used but not defined herein have the meanings given to them in the Operating Agreement.

*[Signature Page Follows]*

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the Effective Date.

"SELLER"

_____

Jack Diamond

"BUYER"

VALUEHEALTH, LLC

By: _____
        Daniel R. Tasset, Authorized Agent

Schedule 1

(Company Guarantees)

4839-0782-6128, v. 1

## FIRST AMENDMENT TO
## PURCHASE AND SALE AGREEMENT

This FIRST AMENDMENT TO PURCHASE AND SALE AGREEMENT (this "Amendment") is made and entered into by and between made by and between Jack Diamond ("Seller") and ValueHealth, LLC ("the "Buyer"), as of November ___, 2020 (the "Effective Date").

### RECITALS:

A.     Seller and Buyer entered into that certain Purchase and Sale Agreement dated as of October 29, 2020 (the "Agreement"). Capitalized terms used herein but not defined herein shall have the meaning set forth in the Agreement.

B.     The parties to this Amendment (the "Parties") now desire to amend certain terms of the Agreement.

NOW, THEREFORE, for the mutual promises and covenants contained herein and for good and valuable consideration, the sufficiency of which is hereby acknowledged, the Parties agree to amend the Agreement as follows:

1.     **Amendments**.

a.     The Parties hereby agree that in addition to Seller selling Buyer the Transferred Units in the Company, Seller shall transfer to Buyer all of Seller's ownership interest in Health Care Facilities Partners Administration, LLC ("HCFPA") and SDP of Dallas Holdings, LLC ("SDP"). There will not no adjustment to the Purchase Price. The definition of "Transferred Units" shall include Seller's ownership interest in the Company, HCFPA, and SDP.

b.     Section 4 of the PSA, is hereby revised to state: Indemnity, For and in consideration of the terms and conditions of this Agreement, upon the Effective Date, Buyer will indemnify Seller and hold harmless Seller from any claims and responsibilities of Seller arising from or out of the "Company Guarantees" or from activities of the Company, HCFPA, SDP, or its members from the Effective Date forward. In addition, Seller and Buyer will collectively work to cause Company, HCFPA, and SDP to remove Seller as a guarantor of the Company Guarantees. To the extent any lenders will not remove Seller as a guarantor without a substitute guarantor, Buyer agrees to act as a guarantor in lieu of Seller. "Company Guarantees" are described in Schedule 1, attached.

2.     **Counterparts**. This Amendment may be executed in any number of counterparts, each of which will be deemed to be an original and all of which constitute one and the same instrument. A facsimile or electronic copy of either party's signature to this Agreement shall be deemed an original signature for all purposes hereunder.

3.     **Entire Agreement**. The Agreement and this Amendment are binding upon and will inure to the benefit of all the parties and their respective successors, assigns and personal representatives. Except as amended hereby, the terms and conditions set forth in the Agreement remain unchanged.

1

IN WITNESS WHEREOF, the parties hereto have executed this Amendment as of the Effective Date.

"SELLER"

Jack Diamond

"BUYER"

VALUEHEALTH, LLC

By:

Schedule 1

(Company Guarantees)

1. Franklin Synergy Bank in the amount of $1MM
2. ServisFirst Term Loan in the amount of $3.6MM
3. ServisFirst LOC in the amount of $750,000
4. ServisFirst Investment LOC in the amount of $2MM

4834-6482-8112, v. 1



Sandra Kurt, Summit County Clerk of Courts